UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

KENNETH RAY MORPHIS, JR.                                          PLAINTIFF

v.                                    Civil No. 2:14-CV-02027-MEF

SHERIFF STEVEN SMITH and JAIL                          DEFENDANTS
ADMINISTRATOR DAVID SPICER

## MEMORANDUM OPINION

This is a civil rights action filed by Plaintiff, Kenneth Ray Morphis, Jr., pursuant to the

provisions of 42 U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis*, and he is currently

incarcerated in the Marion United States Penitentiary in Marion, Illinois.

The parties have consented to the jurisdiction of a Magistrate Judge to conduct any and all

proceedings in this case, including conducting the trial, ordering the entry of a final judgment, and

conducting all post-judgment proceedings.  (Doc. 12)  Pursuant to this authority, the Court held a

bench trial on April 26, 2016, and now issues the following findings of fact and conclusions of

law.

## BACKGROUND

Plaintiff filed his original Complaint on February 5, 2014.  (Doc. 1)  The events that are

the subject of this lawsuit occurred while Plaintiff was incarcerated in the Logan County Detention

Center (LCDC), located in Paris, Arkansas.  Plaintiff was booked into the LCDC on November

15, 2013, and he remained at that facility until he was transferred to the Arkansas Department of

Correction (ADC) on February 12, 2014.

After summary judgment proceedings, the issues remaining for bench trial included: (1)

1

unsanitary conditions of confinement, specifically the toilet water running through his cell the entire 89 days he was confined in LCDC, as well as no hot or cold running water for drinking and hygiene; (2) unsafe conditions of confinement due to LCDC's inoperable sprinkler system and lack of fire extinguishers within the cell blocks; (3) denial of medical care for his Hepatitis C and after a health incident on December 24, 2014; and, (4) denial of access to news media.

At the bench trial, Plaintiff testified on his behalf by videoconference.  (Doc. 58)  The testimony of the following witnesses was heard on behalf of Defendants: (1) Defendant Sheriff Steven Smith; (2) Defendant Jail Administrator David Spicer; and, (3) former LCDC Correctional Officer Dustin Stark.  (Doc. 58)

Plaintiff filed a proposed Exhibit (Doc. 54) on April 1, 2016.  The Exhibit consisted of Plaintiff's patient record from River Valley Care Services, and it was received in evidence at trial. Plaintiff was also directed to provide copies of the LCDC jail logs which he referred to in his testimony to the Court within 14 days of trial.  These were received in evidence as Plaintiff's Exhibit Two.  The jail logs were filed on May 12, 2016.  (Doc. 60)  Plaintiff also requested leave to submit a newspaper article concerning LCDC, as well as several witness statements.  (Docs. 19-22)  Objections to these proposed exhibits were sustained.

Defendants submitted two Exhibits at trial, which were received in evidence.  (Doc. 66)

## FINDINGS OF FACT

### A.    Unsanitary Conditions of Confinement: Plumbing Issues

In his complaint and summary judgment response, Plaintiff states that the plumbing was never working properly during his incarceration at the LCDC.  *Plaintiff's Response (hereinafter Plff's Resp.)*(Doc. 32) at ¶ 5.  He alleges toilet water ran through his cell, and he had to go without

hot or cold water for drinking and hygiene.  (*Id.* at ¶¶ 2-3)  Plaintiff states maintenance never came to fix the plumbing.  *Id.* at ¶ 6.  Plaintiff agreed with Defendant Spicer that the seals were broken on the toilets; however, he maintains it was sewage that was leaking, and that it produced an awful smell.  *Id.* at ¶¶ 7 & 9.  He maintains it was unsanitary and offensive.  *Id.* at ¶ 8.  Plaintiff states he was unable to clean his hands or cell properly, and he worried about contracting a serious illness and the effect on his Hepatitis C.  *Id.*  He also maintains he became ill with fever and diarrhea and was bed-ridden for three days.  *Id.* at ¶ 9.  Plaintiff admits that the jailers would bring water; however, he contends they did so on their own schedule and not when the water was needed.  *Id.* at ¶ 6.

Defendant Spicer by affidavit states they "do have issues with the plumbing at the jail" from time to time, and the County maintenance man, Barron Bates, is called when they are made aware of a problem.  *Defendants' Exhibit (hereinafter Defts' Ex.)* B at ¶ 4.  In the meantime, Spicer states "we accommodate the inmates in these cells as best as possible by providing them with mops and towels to control the water leakage and having jailers bring them water during time periods in which their sinks are not functioning."  *Id.* at ¶ 5.  Moreover, Spicer asserts that the "leaks in the toilets are the result of damage to the seals around the bottom of the toilets caused by inmates standing on the toilets.  The water that leaks out of these seals is clean water, not sewage."  *Id.* at ¶ 6.

At trial, Plaintiff testified the sink and toilet were a single stainless steel unit.  He did not see anyone stand on, shake, or otherwise "mess with" the toilets.  The units were broken when he was arrested and booked into the jail.  The only water working in the cell was in the toilet for using the toilet.  There was no hot or cold water from the sinks.  He did not request or move to have the

3

water that was coming out of the unit tested to determine if it was coming from the clean water input or the sewage line. He did not do so because, "it is not rocket science that water from a toilet is dirty." He testified no one came to repair the toilet in cell nine during his 89 day incarceration at LCDC. He has worked in construction, and in his experience plumbing issues were always fixed first. He testified he became ill as a result of exposure to the toilet water. He had diarrhea and cramps for three days, and he "felt bad" for six or seven days after that. He felt this was due to the toilet water, and the circumstances were "just inhumane."

Dustin Stark testified the water in the cell nine sink was working when he started employment at the jail sometime in the second half of November, 2013. He worked at LCDC until the second half of June, 2014. Plaintiff's incarceration predated his employment at LCDC. When he got there, the sink in cell nine was working, but there was a leak in the sink. The inmates complained they could hear the leak when they were trying to sleep. The fresh water in cell eight never worked while he was at LCDC. Water was taken back to the inmates when they asked for it. The only time he refused to bring water to inmates was after 10:30 p.m., and then he only refused hot water. He refused because they used the hot water to make coffee and stay up at night. He helped the Logan County repairman, Barron Bates, work on the units in cells seven, eight, and nine. The units had been broken by the inmates. He was "in the floor" helping repair the inlet water for the units in these cells. He did not remember the exact dates of the repair work. He was aware of the existence of grades of water, such as "gray water." The leak did not contain any urine or feces. There was only one repair person for the county, and things were fixed as time allowed. He did not recall if he had logged when Bates came to do the plumbing work in the cells. He testified they did not log everything. The logs were used more to indicate items about the inmates

4

as opposed to maintenance.  He had sometimes logged maintenance, such as when it required moving inmates from cell to cell so that Bates could work.  He did not recall Plaintiff handing him grievances about the water, but they received many grievances, including about the water.  He never threw any grievances away.

Defendant Spicer testified the toilets are one-piece stainless steel units with a sink at the top and toilet at the bottom.  Pipes come into the basins to supply fresh water, and there is a sewage line out.  He examined the leaking units.  "Not one single time was there a need to repair a leaking sewage line."  The only leak he saw was in the supply line.  If the silicone seal broke, then water ran onto the floor.  The seal was broken when inmates stood on the units to communicate to other cells through vents in the wall.  They had Adams Plumbing and other companies out to work on it.  They also had a wet/dry vacuum to use to clean the leak.  He never smelled sewage water, feces, or urine.  The jail was never cited for sewage on the floor or unsanitary leaks.  He freely admitted LCDC had been cited for other issues, but a sewage leak in the cells was not one of those issues.

Defendant Smith testified the jail logs should show when Bates or other plumbers came to work on the plumbing – if the logs were done as they were supposed to be done.  He was not sure this was the case, as it was not a "perfect situation."  He tried to call Bates first for repairs because he was a county employee and easier on the budget than an outside plumbing company.  He told Bates there was a leak and no hot or cold water.  Bates worked on a number of things, and a plumber was called if Bates could not get to the repair quickly or didn't have the skills to fix it.  He was told parts were hard to get for the toilet-sink units, and this caused delays in the repairs.  He did not personally put in any orders for parts because he was not a plumber or maintenance

5

personnel.  He did remember that at times they could not get parts and had to use other things.

At no time did Defendant Smith see or smell sewage.  The leak appeared to be clean water from the input to the units.  In his experience, if there were feces or urine in the water, these substances would have a visual effect on the water and an odor.  No repair person ever told him there was a sewage leak, and the only repairs done were for fresh water leaks.  LCDC was never written up for sewage on the floor.  There were other write-ups, but not for that.  He was never told any inmate was thirsty because they were refused water.  The water running in the cell was not constant, but they were always working on something at LCDC.  He could not remember a time when they were not working on something at LCDC.  He remembered complaints about water not being brought, but never an inmate saying he or she was thirsty.

The jail logs submitted by Plaintiff after the trial focus primarily on whether routine chores were accomplished, such as feeding of inmates, organization of showers for inmates, booking inmates in and out, garbage detail, cleaning detail, administration of medication, etc.  Although some notations concerning repairs were included, there did not seem to be any regularity of the inclusions, and some of the handwritten notations in the logs are difficult to read.  There were no notations concerning water leaks specifically.  Repair notations did appear for a clogged shower drain, broken cameras, glass replacement, a cell door, a hole in the wall between cells, and bunks.  (Doc. 60, pp. 45, 62, 65, 82, 90, 94, 103, 105, 135)

Based on the evidence of record, I find the sink in Plaintiff's cell did not work, so that there was no running water available on demand from the sink in his cell.  The silicone seal at the base of the toilet was broken by inmates standing on it.  Repairs were very slow because it was difficult to get parts for the toilet-sink units, but repairs were attempted on the units in cells seven, eight,

6

and nine while Plaintiff was incarcerated at LCDC.  There is no dispute that water leaked from the broken toilet seal at least part of the time.  The leak was fresh water from the input supply line.  It did not contain sewage.  LCDC provided mops and towels to inmates to clean up the leak.  The facility also used a wet/dry vacuum to clean up the leak.  Jailers provided hot and cold water to the cells on a regular basis and at the request of the inmates.  Only hot water was ever denied, and this was late at night so that inmates would not misuse it.  Plaintiff made no allegation that the toilet was non-functional, or that he was not able to flush the toilet on demand.  Plaintiff does not allege he was denied access to regular showers.  Plaintiff also does not allege meals were served without some form of liquid to drink.

## B.    Unsafe Conditions of Confinement: Fire Equipment

Plaintiff alleges that inmates started a fire in the hallway during a jail riot.  *Resp.* at ¶ 40. Plaintiff states no alarms or sprinklers went off.  *Id.*  Plaintiff asserts that his lungs were seared from the fire, and he also states all the inmates were maced.  *Id.* at ¶ 41.  Plaintiff maintains there were no fire extinguishers in the cell areas where the inmates were housed.  *Resp.* at ¶¶ 38-39.

Defendant Spicer admits that the sprinkler system in the jail is inoperable; however, he maintains the jail is equipped with fire extinguishers and fire detection equipment.  *Id.* at ¶ 7.

At trial, Plaintiff testified he was present when the fire occurred.  A jailer came and maced the inmates, then closed the bean-hole to the cell.[1]  After about 45 minutes to an hour, they were let out of the cell for fresh air.  Plaintiff had to wet his shirt with water from the toilet in order to breathe.  No alarms or sprinklers went off, and there were no fire extinguishers in the back living quarters.  Plaintiff testified this fire seared his lungs, making them dry and uncomfortable.  He was

---

[1] A "bean-hole" is a securable small door used to pass food trays through the cell door.

also maced.  He requested medical attention for his lungs on several occasions and did not receive any.

Plaintiff stated he had medical evidence his lungs were seared, he just did not have that evidence with him the day of the trial.  Plaintiff agreed, however, that he had been in a methamphetamine lab explosion prior to his incarceration at LCDC.  This explosion had been strong enough to shift the house off its foundation.  He testified this meant that LCDC was aware of the condition of his lungs.  He testified that he did not start the fire, and he did not tamper with the camera.  Plaintiff stated the inmates were maced and made to sit for 30 to 45 minutes until they were permitted out of the cell for fresh air.

During cross-examination, Plaintiff testified the fire was on a different occasion than the day on which a riot or "tumult" occurred.  During this riot, inmates broke a bunk off the wall of a cell and used it to batter down the door to cell seven.  Plaintiff was not sure if there was a fire during the riot, but the fire that seared his lungs was not during the riot.  The fire that burned his lungs was caused when books thrown from cell seven were set on fire in the hallway.  He did not throw the books, and he was not sure if they were thrown through the open door to cell seven.  Plaintiff testified he could not supply any medical records concerning treatment or examination of his lungs.  He did not have medical records, he only had grievances.  On re-direct, Plaintiff testified he did not know the dates of the fire when the door was knocked off its hinges, and it was not his job to know.  He did know they were two different occasions.

Dustin Stark testified he was present during the riot.  There was a fire during the riot.  At the time, only one smoke detector in the hallway worked.  That detector did not work when he left because an inmate had tampered with it.  The sprinkler system was not functional when he began

his employment at LCDC.  The system was there, but it was not functional.  Stark testified the riot

started because he told inmates they could not have hot water for coffee after 10:30 p.m.  He called

the other deputies for help.  They broke down the door and started a small fire which was put out

quickly.  There was not enough heat or smoke to sear lungs.  The fire was caused by someone

throwing a lit Bible through a bean-hole.  It was not on fire for long because the Bible was still in

"halfway decent shape."  In his opinion, it could not have been a health hazard, even to someone

with lung problems.  Fire extinguishers were not kept in the cell or the cell blocks for security

reasons.  Instead, they were kept outside the cell block so that inmates could not reach them.  Stark

did not recall any other fires in the jail.

On cross-examination by Plaintiff, Stark testified the riot was when the door was beaten

off the hinges in cell seven.  This was also when the cell eight inmates were maced and the bean-

hole to cell eight was closed.

Defendant Spicer testified he recalled a fire during the riot or "tumult."  He did not arrive

until it was over.  The fire was in the corridor.  If the bean-hole and cell door were closed, there

should not have been much smoke in the cell.  He did not receive any complaints of seared lungs

at that time or later.  He testified it is typical in most jails to keep fire extinguishers outside the

prisoner areas for safety and security reasons.  This was to prevent inmates from using them as a

weapon or discharging them needlessly.  The sprinkler system stopped working prior to the start

of his employment.  The pipes are in still in the ceiling.

Defendant Smith did not have firsthand knowledge of the fire.  He was called after the fact,

and the fire was out and the cell door was down.  He just started clearing it up.  There was no soot

on the ceiling and he did not really remember the smell of smoke.  He was not aware of more than

9

one significant fire during the riot.  There was never a fire large enough to call the fire department while he was sheriff.  He was unaware of any requests for medical attention due to seared lungs.

Plaintiff submitted an unsigned medical intake screening document for LCDC.  This document indicates Plaintiff's physical activity had been limited in the past year because he had been burned.  (Doc. 60, p. 137)  The jail logs do not reflect a notation concerning a fire, although there is notation concerning the attempted stabbing of a jailer by an inmate (Doc. 60, p. 99), cell door repair (Doc. 60, p. 103), and an attempt to burn a window using a "wick."  (Doc. 60, p. 122) There were no photos of soot on a ceiling in Plaintiff's post-trial documentation.

Based on the evidence of record, I find the fire in which Plaintiff alleges his lungs were seared occurred during the riot or "tumult" in approximately mid-January, 2014.  This fire consisted of a Bible lit on fire by inmates and thrown into the hallway outside the cells.  The Bible was only partially burned and was still in fair condition after it was put out with a fire extinguisher. This permits the inference that the fire was put out promptly.  The fire extinguishers were located outside the areas accessible by inmates for safety and security reasons, and this placement is an accepted security practice.

One smoke detector worked at the time of the fire, but the sprinkler system was inoperable, as it had been broken by inmates on an earlier date.  There is no evidence that the fire created sufficient smoke to place soot on the walls or ceiling.  The bean-holes to the cells were closed. The inmates in cell eight, including Plaintiff, were pepper-sprayed during the riot, in which a bunk in cell seven was ripped off the door and used as a battering ram to knock the cell door off the hinges.

There is no record of any medical requests from Plaintiff for seared lungs.  Plaintiff did

10

submit a medical intake record indicating he had been burned in the year prior to his intake, and this had limited his activity.   At trial, Plaintiff testified he had been involved in a large methamphetamine laboratory explosion.   Plaintiff agreed that the explosion was large enough to shift the house the lab was contained in off its foundation, but stated this should have put LCDC on notice concerning the condition of his lungs.

## C.      Denial of Medical Care

In pre-trial documents, Plaintiff states he received no chronic care for his Hepatitis C and no care following an incident on December 24, 2013, when Emergency Medical Services (EMS) was called because Plaintiff believed he had a heart attack or a stroke.

Plaintiff states he did not submit a medical request seeking treatment for Hepatitis C because staff would not bring medical request forms to him. *Resp.* at ¶ 24.   He does contend he submitted grievances about this issue that were never answered. *Id.*   He also indicates he verbally informed staff of his condition and made multiple verbal requests for medical care. *Id.* at ¶ 25.

Plaintiff maintains that his Hepatitis C condition worsened while he was incarcerated in the LCDC. *Resp.* at ¶ 27.   Specifically, he states he did not have enough drinking water to stay hydrated, and this kept his kidneys and liver from functioning properly. *Id.*   Plaintiff states he made numerous verbal requests, but he was not brought back a form to submit a written request until Defendants realized he was going to file this lawsuit. *Resp.* at ¶¶ 33-35.   Prior to that time, Plaintiff states all his requests for forms were denied or ignored. *Id.*   Plaintiff submitted a copy of a grievance dated January 17, 2014, in which he stated he was a chronic care patient, but he failed to state what condition the care was needed for, and he also referenced the December 24, 2013, EMS visit.  (Doc. 1, p. 9)

11

Defendant Spicer indicates he was contacted in the middle of the night on December 24, 2013, about EMS coming to the jail because Plaintiff was having a medical issue. *Defts' Ex.* B at ¶ 9. Spicer was told Plaintiff was "fine but that if his situation worsened, he needed to be taken to a doctor." *Id.* at ¶ 10. To Spicer's knowledge, Plaintiff made no requests for medical care for this issue until January 22, 2014. *Id.* at ¶ 11. He states the grievances attached to Plaintiff's complaint are not part of Plaintiff's jail file, and Spicer had never seen them until this suit was filed.

By January 22, 2014, the Plaintiff had been sentenced to the ADC. *Defts' Ex.* B at ¶ 12. The ADC was contacted for approval to take Plaintiff to a doctor. *Id.; Defts' Ex.* D. Approval was given on January 28, 2014. *Id.* The medical facility inmates are taken to for treatment usually has a wait time of two to three weeks. *Defts' Ex.* B at ¶ 14. Plaintiff was transferred to the ADC during this waiting period. *Id.* at ¶ 15. It was not clear from the summary judgment record, however, whether an appointment was ever made for the Plaintiff prior to his transfer to the ADC. When he was seen at the ADC, Plaintiff states he was seen by a doctor and diagnosed with, among other things, an irregular heartbeat. *Resp.* at ¶ 37.

To Defendant Spicer's knowledge, Plaintiff never made a request to see a doctor about his Hepatitis C. *Defts' Ex.* B at ¶ 16. If he had, Spicer states an appointment would have been scheduled. *Id.*

At the trial, Plaintiff testified that on December 24, 2013, he was playing cards with other inmates when "something came over me." He was disoriented and sweating so heavily his shirt was soaked. He had chest pain and felt like he was going to pass out. His complexion was the color of clay. He did not know if he was having a stroke, a heart attack, "or what." The other inmates beat on the door to get a jailer's attention. The jailer came in and looked at him and took

12

off running.  He was carried up from the cell, the ambulance was called, and he was examined by the EMS team.  The jailer called Spicer at home.  Plaintiff put in several medical requests and grievances to get additional medical treatment to no avail.  He never saw a doctor while at LCDC, even though the ADC approved him going.  His understanding was that he was supposed to see someone so that he could know what happened.  No appointment was made for him to see a doctor while he was in the LCDC.  A record from River Valley Primary Care services (Doc. 54) was admitted into evidence as a business record.  This record showed Plaintiff's last appointment was in 2010, and Plaintiff did not show up for that appointment.

Dustin Stark testified he was not working on December 24, 2013.  Other than the request for ADC permission, he was not aware of any other medical request forms from Plaintiff.  It was the policy of the jail to call an EMT in the event of a medical emergency; otherwise, inmates needed to fill out a medical request form and get it approved by Spicer or Smith.  Stark was not permitted to call and make an appointment.  Stark was aware of the EMS call on December 24, 2013, but he did not recall if it had been logged or not.

Defendant Spicer received a phone call from a jailer late at night on Christmas Eve.  They told him they had called 911 and EMS was coming.  Spicer spoke to the EMS personnel, and they told him that they had checked out Plaintiff and he appeared fine.  If his symptoms continued or worsened, then he needed to see a doctor.  He was not told to get him to a doctor to check his bloodwork.  Spicer did not remember Plaintiff ever complaining of shortness of breath, chest pain, or any other symptoms.  He did remember him demanding to see a doctor.  He recalled having a conversation with him about seeing a doctor, but he did not recall the date or the circumstances.  He was not aware of any grievances until this lawsuit was filed.  Usually either he or the Sheriff

13

would answer grievances.  The request for medical treatment was approved by the ADC on January 28, 2014.  LCDC uses several clinics, depending on what type of care is needed.  These include River Valley, Cooper Clinic, and North Logan County.  It seemed to him that he had made an appointment for Plaintiff, but he got the call to take Plaintiff to the ADC before the appointment. He did not share the fact of appointments with jailers, because when he had done so in the past, word got out to the inmate's family members and caused a security risk.  He did not know if the attorneys had documentation of an appointment being made.  He only informed jailers when it was necessary to make transport plans.

Defendant Smith testified the jail log should show an EMS comment.  He did not recall any complaints from Plaintiff concerning chest pain or other symptoms.  He did not have any involvement or interaction with EMS or any other medical personnel.  He conferred with Spicer, but medical issues were Spicer's job.

Based on the evidence of record, I find Plaintiff noted he had Hepatitis C on his intake form, but there is no evidence he ever explicitly requested care for his Hepatitis C while in LCDC. Plaintiff experienced a medical event on December 24, 2013, complaining of chest pain, profuse sweating, pale complexion, and cognitive disorientation.  The jailer who came to the cell in response to call from other inmates saw Plaintiff and literally ran to call for Emergency care. Plaintiff was promptly examined by the EMS team.  Defendant Spicer spoke to the EMS personnel at the time of the incident, and EMS personnel told him they had checked out Plaintiff and that he appeared to be fine at that time.  They recommended Plaintiff see a doctor if he continued to experience symptoms or if his symptoms worsened.  Plaintiff did not allege he had any continued or exacerbated cardiac symptoms during this case, and there is no evidence of such in the record.

14

At trial, Plaintiff made it clear he wanted to go to the follow-up appointment because he wanted to know what had happened on December 24, 2013.  Plaintiff submitted a grievance for a follow-up appointment in writing on January 17, 2014.  As Plaintiff had been sentenced to the ADC, but not yet transferred there physically, a medical request form was sent to the ADC on January 22, 2014.  The ADC approval was received on January 28, 2014.  The typical wait time to arrange an appointment after an approval is received is between two to three weeks.  Plaintiff was physically transferred to the ADC on February 12, 2014, fifteen days after the approval from the ADC was received.  He did not see a doctor for a follow-up examination before being transferred to the ADC.

### D. Denial of Access to News Media

According to Plaintiff's pretrial documents, newspapers may have come into the jail with the church organizations, but they never made it back to the pod for the inmates' use.  *Resp.* at ¶ 19.  He indicates there were no televisions, and the newspapers were "very seldom ever brought back to inmates."  *Id.* at ¶ 20.  Plaintiff feels he was being purposely secluded from current events.  *Id.* at ¶ 22.

Defendant Spicer asserts that inmates are provided with plenty of newspapers.  *Id.* at ¶ 18.  Spicer states they "have church organizations who visit the jail almost daily who bring the inmates newspapers in addition to religious reading material."  *Id.* at ¶ 19.  Inmates are also allowed to receive newspapers at the jail.  *Id.* at ¶ 20.  Spicer states there are "no restrictions on inmates being allowed access to newspapers."  *Id.*

At the trial, Plaintiff testified that pastors brought plenty of newspapers, but the newspapers very seldom made it "back there" to read because other inmates took them.

15

Dustin Stark was asked about the disbursement policy for reading materials. He testified there were plenty of newspapers and reading material in the cells, and they were being passed around by the inmates. The inmates tore up newspapers and even used them for bunk bed curtains. Newspapers were there and available. If someone brought a paper or some other reading material in for an inmate, that inmate would receive it once it had been reviewed. He personally would take out "trash bags-full" of newspapers and reading material from the cells during shakedowns.

Defendant Smith testified there were newspapers in LCDC, but he could not testify that they got one every day. One of the day jailers would bring one until she got sick. There were numerous newspapers in the cells. The inmates would shred them, plug vents with them, and throw them everywhere. They posed a fire hazard and resulted in poor hygiene and clutter. LCDC did not prevent inmates from receiving newspapers or magazines as long as they were checked. There was plenty of reading material.

Based on the evidence of record, I find there was no absolute ban or source restriction on newspapers, magazines, or other reading material. LCDC did not provide newspapers or television to the inmates, but religious organizations came to LCDC on an almost daily basis and provided newspapers. Plaintiff agreed that there were plenty of newspapers in the jail, but due to the distribution process, or lack thereof, the papers did not make it back to his pod because other inmates were able to take them. If free-world individuals wished to bring newspapers or other reading material for a specific inmate, the items would be given to that inmate once the items passed content screening. There was no testimony or allegation that Plaintiff was prevented from ordering subscriptions to newspapers or other reading material, subject to the same content screening. Reading material in the cells was sufficiently abundant that inmates misused the

16

newspapers, and regular shakedowns of the cells were required.

## CONCLUSIONS OF LAW

### A. Conditions of Confinement – Plumbing and Fire Equipment

Plaintiff's Eighth Amendment rights were not violated by the plumbing issues or a lack of fire equipment.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis,* 523 U.S. 833 (1998) (citation omitted). The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend.VIII.  Detention centers must provide pretrial detainees with "reasonably adequate sanitation, personal hygiene, and laundry privileges . . . ." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1045 (8th Cir. 2012) (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)).  The Eighth Amendment also prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities.  *Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir. 1996); *see also Hall v. Dalton,* 34 F.3d 648, 650 (8th Cir. 1994) ("[I]n this circuit, the standards applied to Eighth Amendment and Fourteenth Amendment claims have been the same.").

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element.  *See Revels v. Vincenz,* 382 F.3d 870, 875 (8th Cir. 2004) (*citing Wilson v. Seiter,* 501 U.S. 294, 298 (1991)).  "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities.  The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner." *Revels,* 382 F.3d at 875 (citations

17

and internal quotation marks omitted). Deliberate indifference is established when the Plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102 (1976). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Furthermore, "[c]laims under the Eighth Amendment require a compensable injury to be greater than *de minimis*." *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008).

The fresh water input leak from the toilet did not constitute an excessive risk to Plaintiff's health and safety. Nor did Plaintiff allege that his toilet did not flush. Plaintiff was not exposed to sewage, therefore his allegation that he became ill with a gastrointestinal disorder due to exposure to sewage is not credible. Even if Plaintiff had been exposed to raw sewage, such exposure does not automatically constitute an Eighth Amendment violation. *Smith*, 87 F.3d at 268 ("[N]ot every overflowed toilet in a prison amounts to a constitutional violation.").

The mere fact of slow repairs and the presence of water on the floor of the cell are also not constitutional violations. The delays in repairing the units were caused by the difficulty in finding and obtaining parts for the units, which were repeatedly broken by the inmates. Repairs were attempted in cells seven, eight, and nine. LCDC provided mops and towels to inmates to contain the leakage, and a wet/dry vacuum was also used to extract the water. Plaintiff was not actually harmed by the leak. The Eighth Circuit has found a similar situation to be constitutional in *Frye v. Pettis County Sheriff Dept*., 41 F. App'x 906, 907-08 (8th Cir. 2002). In that case, plaintiff's toilet leaked both fresh water and sewage. The jail staff declined to move Plaintiff to another cell

18

and, instead, provided blankets and towels to help absorb the leakage.  Frye slipped on the water and fell, suffering a closed head injury and concussion.  Frye was returned to the same cell after the fall, and a plumber tried to fix the toilet.  The fact that jail staff responded and tried to remedy the problem was key to the analysis.  "The fact that the remedies fell short of curing the problem does not show the officials were deliberately indifferent to Frye's health and safety" when the officials were not aware the towels were insufficient or that the leakage was "sufficiently serious" to cause a fall.  *Id.* at 908.  *See also, Garner v. Sanders*, No. 08-6031, 2009 WL 2905586, * 8 (W.D. Ark. Sept. 4, 2009) (when "water blankets" were used to soak up a leak from plumbing, and a plumber was attempting to fix the dated plumbing, there was "simply nothing to suggest Defendants failed to act in the face of a risk of harm.").

The lack of hot and cold running water in Plaintiff's cell due to the broken sink did not constitute an excessive risk to Plaintiff's health and safety.  Access to a sufficient quality and quantity of water for drinking and basic personal hygiene is, of course, a minimal life necessity. *See e.g., Scott v. Carpenter*, 24 F. App'x 645, 647 (8th Cir. 2001) (unpublished) (no disagreement that basic personal hygiene falls within the minimal civilized measure of life's necessities); *Spires v. Paul*, 581 F. App'x 786, 792-94 (11th Cir. 2014) (housing an inmate in a cell without potable water for several days and forcing him to drink from the toilet to survive stated an Eighth Amendment violation).  But, "[n]othing in the Constitution requires that each prisoner be provided with clean, cold, warm, or any other form of running water in his cell. . . ."  *Jelinek v. Roth*, 33 F.3d 56, *2 (7th Cir. 1994) (unpublished) (plumbing in cell that produced only water contaminated with rust that was undrinkable and unsuitable for bathing does not implicate the Eighth Amendment); *see also, Smith v. Copeland*, 892 F.Supp. 1218, 1230 (E.D. Mo. 1995) (turning off

water in a cell except for brief periods to flush the toilet, and providing drinking water with each meal did "not deprive plaintiff of minimally necessary drinking water or hygienic requirements") *aff'd*, 87 F.3d 265 (8th Cir. 1996); *Narducci v. Fields*, 62 F.3d 1428 (10th Cir. 1995) (unpublished) ("a lack of light, a lack of running water, poor cell ventilation, and placement in an individual cage for outdoor exercise" did not rise to level of constitutional violation); *Downs v. Carter*, 2016 WL 1660491, \*8 (N.D. Illinois) ("There is no constitutional right to water on demand.").

Defendants provided hot and cold water to the cells where the sinks were not working. Dustin Stark testified he never refused to provide cold water, but did refuse hot water late at night because the inmates misused it. Defendant Smith testified he remembered complaints about the water situation, but no complaints that anyone was thirsty. Plaintiff did not allege he was denied access to water outside his cell or during meals. He also did not allege he was denied access to regular showers. Plaintiff's allegation that a lack of drinking water harmed his liver and kidneys and exacerbated his Hepatitis C is not credible given the evidence. Plaintiff provided no objectively verifiable medical evidence that he was injured by the lack of running water in the cell.

Finally, Plaintiff's claim that the lack of fire equipment resulted in an injury to his lungs is not credible due to the small size and limited duration of the fire. Defendants admitted the fire sprinklers were inoperable; but, as Plaintiff was not injured by the fire, the lack of fire sprinklers is irrelevant. The fire in question was a Bible, lit by inmates during an inmate riot, and thrown into the hallway. The bean-holes to the cells were closed, and the fire was promptly put out using a fire extinguisher. That the fire extinguishers were kept out of reach of the inmates is a common, and understandable, security practice, and it does not demonstrate deliberate indifference on the part of LCDC. The Bible was only partially burned, and it was still in fair condition after the fire

was put out.  It is simply not reasonably believable that Plaintiff's lungs were "seared" by the heat and smoke of a partially burnt Bible in a hallway outside of his cell.  To the extent he may have any lung damage, it is much more probable that this occurred when he was burned in a large methamphetamine laboratory explosion in the year prior to his incarceration at LCDC.  Plaintiff also did not provide any objectively verifiable medical evidence as to his alleged lung damage.

Thus, although the facilities at LCDC were far from ideal, Plaintiff's Eighth Amendment rights were not violated by any condition of confinement at LCDC.

## B.  Denial of Medical Care

Defendants were not deliberately indifferent to Plaintiff's medical needs, either for his Hepatitis C or potential cardiac issues after the incident on December 24, 2013.

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs.  *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012).  To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs,* 512 F.3d 488, 499 (8th Cir. 2008) (internal citation omitted). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id.*

It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks and citations omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Id.* Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment, and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05. However, the "Constitution does not require jailers to handle every

22

medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). The objective seriousness of delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence in the record. *Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir. 2005). Unless, however, the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub,* 638 F.3d at 919 (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir. 1995); *cf. Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation").

Defendants were not deliberately indifferent to Plaintiff's Hepatitis C or after his alleged cardiac issues on December 24, 2013, because there was no delay in needed or requested care. Plaintiff's allegations and testimony concerning repeated verbal requests and grievances for medical care, as well as his allegations of withheld medical request forms, are not credible. Plaintiff never explicitly requested care for his Hepatitis C while at LCDC.

Regarding Plaintiff's suspected cardiac incident on December 24, 2013, Defendant Spicer was told Plaintiff was fine, and further evaluation was necessary only if Plaintiff experienced further symptoms. There is no indication that Defendants were slow to call for emergency care when Plaintiff experienced his symptoms on December 24, 2013. There is no indication that Plaintiff actually experienced any further cardiac symptoms after December 24, 2013. Instead, Plaintiff understood he was to receive a follow-up to determine what had actually happened. Plaintiff

23

submitted the grievance about his follow-up appointment on January 17, 2014; a medical request concerning his cardiac issues was submitted to the ADC on January 22, 2014; and, the request was approved by the ADC on January 28, 2014. Plaintiff was transferred to the ADC on February 12, 2014, before he could see a doctor. The request was sent to the ADC promptly, and he was transferred before the end of normal range of two to three weeks to receive an appointment. I note that a wait time of two to three weeks to see a physician is not uncommon for non-emergency care even in the free-world. There was, therefore, no delay in pursuing Plaintiff's medical care after Plaintiff actually requested that care. Further, Plaintiff has provided no objectively verifiable evidence that he was harmed by any delay in treatment for his Hepatitis C or cardiac issues. Defendants were, therefore, not deliberately indifferent to Plaintiff's medical needs.

### C. Denial of Access to News Media

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1972). Among other things, the "Constitution protects the rights to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).

Prison policies impinging on inmates' First Amendment rights are valid only if they are reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999). "[E]ven though this court engages in a deferential review of the administrative decisions of prison authorities, the traditional deference

24

does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." *Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir. 1993).

In determining whether a regulation or restriction is reasonable, the court employs a balancing test considering: (1) whether a rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and, (4) whether obvious, easy alternatives exist. *Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir. 1993) (citing *Turner*, 482 U.S. at 89-91).

Absolute bans on inmate access to newspapers and magazines, as a general rule, violate the First Amendment because they are an "exaggerated response" to legitimate penological needs. *See Mann v. Smith*, 796 F.2d. 79, 82 (5th Cir. 1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979); *see also Koger v. Dart*, 114 F.Supp.3d 572, 583 (N.D. Ill. 2015) ( when an easy alternative existed, a total ban on newspapers was an exaggerated response to the jail's concerns); *United States ex rel. Manicone v. Corso,* 365 F.Supp. 576, 577 (E.D.N.Y. 1973) ("There is no basis for total restrictions on prisoners' access to the news in view of their clear First Amendment rights.")  Furthermore, a number of courts have held that prisoners have a right to receive and read newspapers. *See e.g, Sizemore v. Williford,* 829 F.2d 608, 610 (7th Cir. 1987) (absent restrictions based on legitimate goals of confinement, prison inmates retain First Amendment right to receive and read newspapers); *Mann,* 796 F.2d 79, 82–83 (county jail's policy of banning newspapers and magazines violated a pretrial detainee's First Amendment rights where the state failed to show the

ban served a legitimate government objective); *Wilkinson v. Skinner,* 462 F.2d 670, 673 n .5 (2nd Cir. 1972) ("refusal to deliver a newspaper would ordinarily be interference with appellant's first amendment rights"); *Rowland v. Jones,* 452 F.2d 1005 (8th Cir. 1971) (prison authorities' denial of access to newspaper "Muhammad Speaks" constituted prior restraint in violation of First Amendment); *Spellman v. Hopper,* 95 F. Supp.2d 1267 (M.D. Ala. 1999) (absolute prohibition on subscription magazines and newspapers applied to administrative segregation inmates in Alabama is not reasonably related to legitimate penological goals).

Inmate access to news media can, however, be restricted in the proper circumstances. At least one absolute ban on newspapers and magazines, as well as other restrictions, has been found to pass constitutional muster. In *Beard v. Banks*, 548 U.S. 521 (2006), an absolute ban on newspapers, magazines, and personal photographs was found constitutional for a small group of inmates in a long term segregation unit. These inmates had "flunked out" of the less restrictive behavioral units, and were considered the "most incorrigible and recalcitrant inmates." *Id*. at 526. If an inmate progressed in the program, they were then permitted to receive one newspaper and five magazines. Of the several penological rationales presented to support the ban, the Supreme Court found the "increased incentive for better prison behavior" to satisfy the requirements of *Turner*.

Limiting the sources from which an inmate may obtain reading materials has also been found to be constitutional. In *Bell v. Wolfish*, 441 U.S. 520 (1978), the Supreme Court held a restriction which prohibited inmates from receiving hardcopy books from any source other than a publisher, book club, or bookstore did not violate the First Amendment because it was a rational

response to the security issue of smuggled contraband. Similar "publisher-only" rules, which require inmates to receive their reading material from approved commercial sources, have since been upheld as constitutional when applied to softcover books, magazines, and newspapers. *See Cotton v. Lockhart*, 620 F.2d 670, 672 (8th Cir. 1980) (publisher-only restriction on hardcover and softcover books a "reasonable and constitutional response"); *see also Ward v. Washtenaw County Sheriff's Dept.*, 881 F.2d 325, 328-30 (6th Cir 1989) (publisher-only restriction on magazines constitutional); *Hurd v Williams*, 755 F.2d 306, 307-08 (1985) (publisher-only restriction on newspapers, periodicals, and softbound volumes constitutional); and, *Kines v. Day*, 754 F.2d 28 (1st Cir. 1985) (publisher-only restriction on hardcover, softcover, and newspaper publications constitutional).

In this case, Plaintiff had access to multiple sources of newspapers and other reading material while at LCDC. There was no absolute ban or source restriction on newspapers or other reading materials at LCDC.[2] All parties agree that religious organizations regularly brought newspapers to the jail. Plaintiff testified that there were plenty of newspapers at the jail. Instead, Plaintiff's complaint is that the distribution process for donated newspapers was inefficient because other inmates could take the papers before he could read them. Neither Plaintiff nor Defendants detailed the exact process of the donated newspaper distribution system. Those details are analytically irrelevant, however, because Plaintiff had access to additional sources for his newspapers or other reading material. Plaintiff was free to order newspaper subscriptions or other reading materials for himself.[3] He was also free to receive newspapers and other reading materials

---

[2] It is, therefore, not necessary to evaluate the balancing factors of the *Turner* test.

[3] The Court is cognizant that this would require Plaintiff to pay for materials rather than have them brought to him for free; however, the Supreme Court has held that the "loss of cost

from free-world individuals, such as friends or family.  Provided the materials passed the LCDC content review, he would receive those materials directly.  Thus, even if the LCDC distribution process for the donated newspapers was not a model of efficiency, his First Amendment rights were not violated because he was not limited to this source for newspapers or other reading material.

Plaintiff also alleged there was no access to television while at LCDC.  An inmate possesses no Eighth Amendment right to watch television, and there is serious doubt that a First Amendment right exists either.  *See e.g., Hofland v. Thompson*, No. 9-174-B-W, 2009 WL 3517586, at \*3 (D. Me. Oct. 29, 2009) (recommended decision) (there is "serious question" as to whether or not an inmate possesses a First Amendment right to view his desired television news programming); *see also Scheanette v. Dretke*, 199 F. App'x 336, 337 (5th Cir. 2006) (inmate had "no constitutional right to watch television and because watching television is not a life necessity or a basic human need, his Eighth Amendment and retaliation claims" failed); *Elliott v. Brooks*, 188 F.3d 518 (10th Cir. 1999) (unpublished) (system of programming selection which favored black majority did not violate inmate's constitutional rights because "[t]here is no constitutional right to watch television"); *Murphy v. Walker*, 51 F.3d 714, 718 n. 8 (7th Cir. 1995) (no Eighth Amendment right to television); *McClure v. Thaler*, No. 5:11CV180, 2012 WL 2885767, at \*1 (E.D. Tex. May 31, 2012) (report and recommendation) ("The First Amendment's freedom of speech clause does not protect the public's right to media access; rather, it protects speakers from unjustified public intrusion"); *Manley v. Fordice*, 945 F. Supp. 132, 137 (S.D. Miss. 1996) ("No court has recognized

---

advantages does not fundamentally implicate free speech values."  *Bell*, 441 U.S. at 552 (internal quotations omitted).

a federal constitutional right to the usage of radio and television by inmates"); and, *Hall v. Phillips*, 2005 WL 3783651, at \*7-8 (W.D. Ark. 2005) (report and recommendation) (inmate's rights not violated when detention center did not furnish books, newspapers, magazines, radio, or television, because inmate was not prevented from obtaining those materials for himself.).

Further, as discussed above, Plaintiff had access to multiple sources of newspapers and other reading material. *See e.g., Koger*, 114 F. Supp. 3d at 581 ("television cannot supply the depth and diversity of coverage that newspapers can provide") (internal citations omitted); *Sanders v. Ryan*, 484 F. Supp. 2d 1028, 1039 (D. Ariz. 2007), *aff'd in part, vacated in part Sanders v. Ennis-Bullock*, 316 F. App'x 610 (9th Cir. 2009) (despite denial of headphones to hearing-impaired inmate, he "was still able to receive information, ideas, and messages through books, magazines, and newspapers; the television is not the sole conduit for information").

Because Plaintiff had access to multiple sources to obtain newspapers and other reading materials, LCDC's failure to provide television access did not violate his First Amendment rights.

## CONCLUSION

For the reasons stated and upon the authorities discussed above, the Plaintiff's Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**.

A separate judgment in accordance with this opinion will be entered.

Dated this 24th day of March, 2017.

/s/ *Mark E. Ford*

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE